## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Stephanie L.,                                        Case No. 23-cv-3220 (ECW)

        Plaintiff,

v.                                                        **ORDER**

Leland Dudek,[1]
Acting Commissioner of Social Security,

        Defendant.

_____

This matter is before the Court on Plaintiff Stephanie L.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 12) and Defendant's SSA Brief in opposition to that Motion (Dkt. 15).[2]  Plaintiff filed this case seeking judicial review of a final decision by Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplementary security income ("SSI").  (Dkt. 1.)  For the reasons stated below, Plaintiff's Motion is denied.

_____

[1]     The Complaint named Kilolo Kijakazi, who was the Acting Commissioner of Social Security at that time.  (*See* Dkt. 1.)  Michelle King became the Acting Commissioner of Social Security on January 21, 2025.  King then resigned as Acting Commissioner and Leland Dudek became the Acting Commissioner on or about February 19, 2025.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Dudek should be substituted for as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]     As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

# I.    BACKGROUND

Plaintiff filed a Title XVI application for supplemental security income on February 2, 2022, alleging disability beginning December 1, 2019.  (R. 211-16.)[3] Plaintiff's application alleged disability due to lupus, high blood pressure, sciatica, prediabetes, high cholesterol, arthritis, migraines, neuropathy, and anxiety.  (R. 241.)  Her application was initially denied on June 16, 2022 (R. 80) and reconsideration was denied on August 3, 2022 (R. 92).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on February 8, 2023 before ALJ Robert Tjapkes.  (R. 17, 28.)  The ALJ issued an unfavorable decision on March 14, 2023, finding that Plaintiff was not disabled from the application date through the date of the ALJ's decision.  (R. 14-33.)[4]

Following the five-step sequential evaluation process under 20 C.F.R. § 416.920(a)[5] (R. 18-19), the ALJ first determined at step one that Plaintiff had not

---

[3]    The Social Security Administrative Record ("R.") is available at Dkt. 7.

[4]    Plaintiff previously applied for SSI benefits on March 16, 2020, but that application was also denied.  (*See* R. 62-79.)

[5]    The Eighth Circuit has described the five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the

engaged in substantial gainful activity since February 2, 2022.  (R. 19.)  At step two, the

ALJ determined that Plaintiff had the following severe impairments: lumbar degenerative

disc disease ("DDD"); systemic lupus erythematosus ("lupus" or "SLE"); and migraines.

(R. 19.)  The ALJ also found the following impairments were nonsevere: cervical DDD;

Sjogren's syndrome; hypertension; gastroesophageal reflux disease; coronary artery

disease; osteopenia; diabetes mellitus; generalized anxiety disorder; panic disorder; and

posttraumatic stress disorder.  (R. 19.)

    At step three, the ALJ determined that Plaintiff did not have an impairment that

met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part

404, subpart P, appendix 1.  (R. 22.)

    At step four, after reviewing the entire record, the ALJ found Plaintiff's RFC to be

as follows:

> After careful consideration of the entire record, I find that the claimant has
> the residual functional capacity to perform light work as defined in 20 CFR
> 416.967(b) except she can perform frequent reaching, handling, and
> fingering. She can have no exposure to extremes of cold or heat. She is
> capable of occasional climbing of ladders, ropes or scaffolds and occasional
> crouching, crawling or stooping.

(R. 22.)  In arriving at this RFC, the ALJ found that Plaintiff's medically determinable

impairments could reasonably be expected to cause her alleged symptoms, but that

Plaintiff's statements concerning the intensity, persistence, and limiting effects of her

---

Commissioner to prove that there are other jobs in the national economy that
the claimant can perform.

*Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).

symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (R. 23.)

At step five, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a medical records clerk.  (R. 26.)  In addition, the ALJ found that Plaintiff was capable of performing other work, such as merchandise marker (DOT 209.587-034) with 137,000 jobs in the national economy, cashier II (DOT 211.462-010) with 465,000 jobs in the national economy, and cleaner, housekeeping (DOT 323.687-014) with 178,000 jobs in the national economy.  (R. 27.)

Accordingly, the ALJ found that Plaintiff was not disabled since February 2, 2022, the date the application was filed, through the date of the March 14, 2023 decision.  (R. 27-28.)  Plaintiff requested review of the decision on March 31, 2023.  (R. 7-13.)  On August 23, 2023, the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-6.)  Plaintiff then commenced this action for judicial review.  (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record in its analysis only when it is helpful for context or necessary for resolution of the specific issues presented by the parties.

The Court notes that although Plaintiff's application alleged disability beginning December 1, 2019 (R. 211), SSI benefits are not payable prior to the application filing

date, making the relevant period of review from February 2, 2022,[6] the date Plaintiff filed

her application, to March 14, 2023, the date of the ALJ's decision.  *See* 42 U.S.C.

§ 1382(c)(7); 20 C.F.R. § 416.335; *see also Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir.

2013) ("An application for disability benefits remains in effect only until the issuance of

a 'hearing decision' on that application, so the evidence of [claimant's] admission [to a

hospital for depression several months after the ALJ's determination] cannot affect the

validity of the ALJ's determination.") (citing 20 C.F.R. §§ 404.620(a), 416.330); *Cruse v.*

*Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989) ("Cruse asserts she was disabled before

filing her application for SSI on March 22, 1983.  However, SSI benefits are not payable

for a period prior to the application . . . ."); *Storey v. Colvin*, No. C 14-4104-MWB, 2015

WL 5970669, at *1 (N.D. Iowa Oct. 14, 2015) ("However, SSI payments are not payable

for a period prior to the application date, pursuant to 20 C.F.R. § 416.335, so the relevant

period for a determination of whether or not Storey was disabled is from February 14,

2012, the date of his application, through June 11, 2013, the date of the ALJ's decision.")

(citing *Cruse*, 867 F.2d at 1185.  And while "Plaintiff may not have been entitled to

benefits prior to the application date, *see* 20 C.F.R. § 416.335, Plaintiff's medical records

prior to the application and near or after the onset date were potentially relevant to the

ALJ's determinations regarding Plaintiff's impairments, symptoms, credibility and

limitations with respect to the period for which he could receive benefits."  *Rutigliano v.*

---

[6]     Plaintiff did not dispute this aspect of the ALJ's decision or the filing date of
February 2, 2022.

*Colvin*, No. CV 13-01897 AS, 2015 WL 3453338, at *3 (C.D. Cal. May 29, 2015); *see also* 20 C.F.R. § 416.912(d).

## II.        RELEVANT FACTUAL RECORD

At the time of filing her application for SSI benefits, Plaintiff was 52 years old, had completed two years of college, had prior training as an emergency medical technician, and had previously worked as an administrative assistant, Epic Support Specialist, ROI specialist,[7] and hair specialist.  (R. 81, 84, 229-234.)

## A.    Medical Record

Plaintiff's medical record includes records from the University of Chicago in Chicago, Illinois and the Mayo Clinic in Rochester, Minnesota.  (*E.g.*, R. 368-473.)  It appears she moved from Rochester to Chicago during or shortly after 2018, and then back to Rochester from Chicago in September 2021.  (*See* R. 413, 425.)

In 2010, Plaintiff was diagnosed with SLE and was prescribed a variety of medications to treat her symptoms, continuing through the date of her SSI application.  (*See* R. 379, 501-03.)  An appointment note from April 8, 2022 states that Plaintiff was, at the time of her diagnosis, treated with "high doses of steroids and methotrexate,"[8] before being moved to subcutaneous injections.  (R. 501; *see also* R. 379.)  In June 2020, she reported that the methotrexate alleviated her symptoms for years, but was

---

[7]    "ROI specialist" is not defined in the record.  The Court understands this to be a "Release of Information" Specialist.

[8]    Methotrexate is a medication used as an immunosuppressant for autoimmune diseases.  *See* Methotrexate, Nat'l Lib. of Med. (Dec. 11, 2024), https://www.ncbi.nlm.nih.gov/books/NBK556114 (last visited Feb. 27, 2025).

discontinued due to GI symptoms in 2015, when she was moved to hydroxychloroquine,[9] apparently discontinuing that medication due to lethargy and then starting it again in September 2016 at 200 mg, later increasing her dose to 400 mg daily, with good response and tolerance. (R. 379.) In April 2022, she reported that she stopped hydroxychloroquine in 2017 due to tinnitus,[10] but then reinitiated that medication in September 2017, and then had her dose doubled in 2018. (R. 501.) She also reported in April 2022 that she was taking 200 mg of hydroxychloroquine daily in September 2021, but appeared to be taking 2 pills daily as of April 2022. (R. 501.)

On December 9, 2016, Plaintiff was assessed for migraines. (R. 413-14.) As to the migraines, the doctor stated:

> Patient has a longstanding history of migraines and previously was seeing neurology in Chicago. She notes auras with her migraines. Typically she notes pressure and pain in the frontal/retro-orbital region. She has trialed tripped hands[11] in the past but this caused significant fatigue, nausea, malaise and she did not feel she could tolerate these medications. She

---

[9]    Hydroxychloroquine is a medication used to treat SLE by decreasing the activity of the immune system. *See* Hydroxychloroquine, MedlinePlus, https://medlineplus.gov /druginfo/meds/a601240.html#:~:text=Hydroxychloroquine%20is%20in%20a%20class,a ctivity%20of%20the%20immune%20system (last visited Feb. 27, 2025).

[10]    Tinnitus is the perception of sound that does not have an external source. Tinnitus, Nat'l Inst. on Deafness & Other Commc'n Disorders (May 1, 2023), https://www.nidcd.nih.gov/health/tinnitus#:~:text=Tinnitus%20(pronounced%20tih%2D NITE%2D,such%20as%20roaring%20or%20buzzing (last visited Feb. 27, 2025).

[11]    The Court assumes "tripped hands" was a reference to triptans, which is a class of medications used to treat migraines. *See* Triptans, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/24998-triptans (last visited Feb. 27, 2025).

subsequently has been managed on Topamax.[12] Previously she was developing migraines 3 times per week, but with initiation of Topamax she notes that this has slightly decreased to roughly 7-8 times per month. However she would like better management of her migraines.

(R. 413.)

Plaintiff believed the heartburn medication she was taking was causing phantosmia, creating smells of cigarette smoke, but those smells continued after the medication was discontinued.  (R. 414.)  Plaintiff was diagnosed with "[r]efractory migraine with aura," specifically "[m]igraine with aura, intractable, without status migrainosus."  (R. 370, 410.)  An intractable migraine is a "persistent headache that is difficult to treat or fails to respond to standard and/or aggressive treatment modalities." Stephen D. Silberstein et al., Defining the Pharmacologically Intractable Headache for Clinical Trials and Clinical Practice, Nat'l Lib. of Med. (Oct. 2010), https://pubmed.ncbi.nlm.nih.gov/20958296 (last visited Feb. 27, 2025.)  Status migrainosus refers to a migraine complication describing "a persistent debilitating migraine attack lasting for more than 72 [hours] with little reprieve, leading to functional disability."  Salwa Kamourieh et al., Status Migrainosus, Nat'l Lib. of Med. (2024), https://pubmed.ncbi.nlm.nih.gov/38307660/#:~:text=Status%20migrainosus%20is%20on o%20of,reprieve%2C%20leading%20to%20functional%20disability (last visited Feb. 27, 2025.)  She received the same diagnosis on March 13, 2017.  (R. 370.)

---

12      Topamax is a brand name for topiramate, a medication used to prevent migraines by calming overactive nerves in the body.  *See* Topiramate Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/20648-topiramate-tablets (last visited Feb. 27, 2025).

On April 29, 2020, Plaintiff consulted with University of Chicago Physical Therapist Zachary Stapleton regarding pain in her back. (R. 386.) PT Stapleton noted that Plaintiff had the "same concerns" as she had for "many months" but that "there has been a slight increase in [the] prevalence of back pain over the past two months." (R. 386.) PT Stapleton advised Plaintiff to increase her total steps to over 8,000 a day, add more sit-stands, and continue the home exercise program she was on. (R. 386.)

On June 15, 2020, Plaintiff was seen by Reem Jan, MD, complaining of "minimal joint complaints," namely that she had developed aching and mild stiffness in the joints of her fingers, with at least one joint appearing swollen. (R. 379.) On examination, Plaintiff was negative for falls, joint pain, and myalgias; positive for headaches; and negative for sensory change, speech change, and weakness. (R. 380.) Dr. Jan thought her symptoms were more consistent with osteoarthritis than inflammatory arthropathy, and Plaintiff was to let Dr. Jan know if her symptoms worsened. (R. 384.)

On July 10, 2020, Plaintiff had an x-ray of her spine completed, which resulted in what the radiologist stated was a "[n]ormal exam." (R. 393-94.) Christopher Status, MD, concluded relating to her C-spine: "No radiographic abnormalities. Specifically the vertebral bodies, disc spaces and alignment are preserved. Soft tissues are unremarkable. Neural foramina are widely patent," while there was "[n]o radiographic abnormality" in her thoracic spine. (R. 393-94.)

On July 27, 2020, Plaintiff was seen by Physical Therapist Michael Vitt. (R. 375.) Plaintiff saw PT Vitt for sciatica pain that she had been experiencing for a "few months," located in her lower back and left hip. (R. 375.) She described it as aching and constant,

but better while laying down, except on her stomach.  (R. 375.)  Plaintiff stated that

sitting for long periods also made it worse.  (R. 375.)  PT Vitt concluded that Plaintiff had

minimal radiation of leg pain that day which he described as "non irritable in nature."  (R.

377.)  Vitt also observed that Plaintiff had limited core strength and otherwise had normal

gait.  (R. 376-77.)

On September 9, 2020, Plaintiff was evaluated by Sarat Yalamanchili, MD, as a

part of a request for disability benefits while living in Illinois.  (R. 361.)  Plaintiff

complained to Dr. Yalamanchili of migraines that occurred one to two times a week.  (R.

361.)  She was going to see a neurologist.  (R. 361.)  She reported that the medication

sumatriptan[13] was helping.  (R. 361.)  She also complained of joint pains in her hands and

wrists, but that that medication helped with that pain.  (R. 361.)  Dr. Yalamanchili

assessed that Plaintiff with strong grip strength, normal muscle strength, and a normal

ability to perform fine and gross manipulation.  (R. 364.)  Examination of her back

showed no evidence of deformity, point tenderness, or muscle spasms.  (R. 363.)

Plaintiff had full range of motion of her spine and no trouble getting on and off the

examination table or rising from a chair.  (R. 363.)  She also had no problems with

"tandem walking, walking on toes, heels, squat, or hop on one leg."  (R. 363.)  Plaintiff

had no difficulty opening a doorknob, squeezing a blood pressure cuff bulb, picking up a

coin, picking up and holding a cup, picking up a pen, buttoning/unbuttoning,

---

[13]    Sumatriptan is a medication used to treat migraine symptoms.  *See* Sumatriptan, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601116.html (last visited Feb. 27, 2025).

zipping/unzipping, and tying shoelaces.  (R. 365.)  Plaintiff's "range of motion of all directions" was normal and that her gait was steady.  (R. 366.)

On September 1, 2021, Plaintiff was treated by James Brorson, MD, for complaints about her migraines.  (R. 857.)  Plaintiff stated that she was having fewer auras and was getting "phantosms [sic]" of the smell of cigarette smoke, sometimes for days at a time.  (R. 857.)  She was also having frequent nausea and mild pain "hanging over my forehead."  (R. 857.)  Plaintiff had started Topiramate[14] 25 mg twice a day with butalbital[15] for break-through headaches.  (R. 857.)  She had stopped taking the medication butalbital/caffeine because caffeine made her headaches worse, and was also avoiding caffeine and chocolate.  (R. 857.)  Plaintiff reported: "The migraine pain just hangs over her forehead, and just stays there, for days.  The nausea has increased.  She estimates about 10 days of migraine headache per month, but more days of the 'lingering' pain, which is present most days."  (R. 857.)  Plaintiff stated that her topiramate had helped "a little bit" in the beginning.  (R. 857.)  Plaintiff was assessed with "migraine with aura," which was "[l]ess severe, but lingering headaches and nausea persist."  (R. 859.)  Dr. Brorson discussed nausea management with Plaintiff and recommended ginger. (R. 859.)  He also recommended that Plaintiff avoid triggers such as sunlight, chocolate or aspartame.  (R. 859.)  Plaintiff had normal gait, grossly normal motor bulk of her

---

[14]    Topiramate is the generic form of Topamax.  *See supra* at footnote 12.

[15]    Butalbital is a type of barbiturate medication that is used for the treatment of pain or headaches.  It is commonly used in combination with other medications such as aspirin or acetaminophen as well as caffeine.  *See* Butalbital, PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/Butalbital (last visited Feb. 27, 2025).

upper extremities, no pronator drift of her hands, and her fine finger tapping movements

showed intact dexterity bilaterally.  (R. 859.)

On December 20, 2021, Plaintiff reestablished care at the Mayo Clinic.  (R. 425.)

She was seen that day to discuss her lupus.  (R. 425.)  Caroline Kimbrough, PA, provided

the following diagnoses related to her lupus, migraines, and back pain:

> 1. Lupus Systemic Erythematosus (HCC)
> Patient has a history of lupus and previously was being seen in the Rheumatology Department by Andrea Polly, last communication 2018. She has previously trialed methotrexate but did not tolerate. She subsequently has been on hydroxychloroquine. Of note patient had moved to Chicago and was receiving care at the University of Chicago, but in September of 2021 moved back to Rochester and is here now to establish care. Her previous provider had increased her Plaquenil[16] to 200 mg b.i.d. roughly 3 months ago due to worsening arthralgias. She states today that day there is only minimal improvement of the arthralgias.
>
> . . .
>
> 6. Migraine Headache With Aura Intractable
> Patient has a longstanding history of migraines and previously was seeing neurology in Chicago. She notes auras with her migraines. Typically she notes pressure and pain in the frontal/retro-orbital region. She has trialed tripped hands [sic] in the past but this caused significant fatigue, nausea, malaise and she did not feel she could tolerate these medications. She subsequently has been managed on Topamax. Previously she was developing migraines 3 times per week, but with initiation of Topamax she notes that this has slightly decreased to roughly 7-8 times per month. However she would like better management of her migraines.
>
> . . .
>
> 11. Sciatica Left
> Over the past 1-2 years patient has struggled with sciatica like symptoms to the left buttock which radiates down the left thigh. This is often triggered by prolonged sitting, driving, or pressure to the gluteal region. Repositioning

---

[16]    Plaquenil is a brand name for hydroxychloroquine.  *See* Hydroxychloroquine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601240.html#:~:text=Hydroxychloroquine%20is%20in%20a%20class,activity%20of%20the%20immune%20 system (last visited Feb. 27, 2025).

will sometimes improves symptoms. She denies any weakness to the bilateral lower extremities. She previously was seeing Orthopedics in Chicago who recommended physical therapy. She saw physical therapy multiple times without significant improvement of symptoms. She subsequently underwent steroid injection earlier this year which she felt only provided transient relief of symptoms. Symptoms returned after 3-4 weeks. She is wondering what else she can do to manage her symptoms. She would like to avoid medications if possible.

(R. 425-27.)

For lupus, the records state Plaintiff was restarted on 200 mg of hydroxychloroquine (Plaquenil) twice daily and PA Kimbrough hoped to reestablish treatment with Rheumatology. (R. 429.) For migraines, PA Kimbrough increased Plaintiff's Topamax dose to 75 mg daily and noted that "patient has been unable to tolerate tripped hands [sic]." (R. 429.) Plaintiff was told to work on hydration and try to identify migraine triggers. (R. 429.) For her back pain, a positive straight leg raise was found to be "consistent with sciatica." (R. 429.) The PA and Plaintiff discussed treatment options for the pain like massage or acupuncture, as well as injections, which Plaintiff deferred "given she did not find benefit in the past." (R. 429.) She also deferred the option of starting Gabapentin. (R. 429.) The physical examination noted her gait was intact. (R. 428.)

On December 21, 2021, Plaintiff was seen at the Mayo Clinic.[17] (R. 410-13.) The notes from the appointment state that Plaintiff had been experiencing sciatica-like symptoms for one to two years in her left buttock which radiated down her left thigh. (R.

---

[17]    It is unclear what medical professional provided the notes from the December 21, 2021 visit.

412.)  She stated that repositioning herself helped, but also denied any weakness in her bilateral lower extremities.  (R. 412.)  Plaintiff had been recommended physical therapy while she was in Chicago, but reported she went multiple times without a significant improvement of symptoms.  (R. 412.)  She received a steroid injection for the pain which provided "transient relief," and the symptoms returned after 3-4 weeks.  (R. 412.)  Plaintiff wanted to avoid medications if possible.  (R. 412.)  A straight leg raise test was positive on the left, "consistent with sciatica."  (R. 412.)  The notes also state that Plaintiff had been experiencing worsening joint stiffness due to her lupus only three months prior, and an increase in her medication only provided a "minimal improvement." (R. 412.)  The appointment notes contain no updates on Plaintiff's migraines or their treatment.

On January 13, 2022, Plaintiff was seen by Alyssa Smith, MD.  (R. 419-21.) Plaintiff complained of phantosmia of cigarette smoke, which was diagnosed as a result of either an upper respiratory infection, inflammation in the nose, or migraines, and she was discharged.  (R. 419-21.)  Of note, the medical notes from that appointment state that Plaintiff was exercising five days a week, 60 minutes per session.  (R. 420.)

On January 26, 2022, Plaintiff visited the Mayo Clinic emergency room with a headache related to a COVID-19 diagnosis and had "some nausea" associated with it despite taking Tylenol and ibuprofen.  (R. 414-15; *see also* R. 417-419 (noting Plaintiff tested positive for COVID-19).)  She complained that the headache was "9/10" in severity and was aching and made her lightheaded and sensitive to lights.  (R. 415.)  The visit notes state: "She does have a history of migraines but states this feels different.  It is

not one-sided and not debilitating." (R. 415; *see also* R. 416 (describing Plaintiff as having "a past medical history of Hypertension and migraine[s]").) Plaintiff was treated with a 30 mg shot of Toradol[18] and discharged. (R. 416-17.) The nurse noted no gait problem or extremity pain, with Plaintiff's cervical back having a full range of motion without pain. (R. 415-16.)

On March 4, 2022, Plaintiff was seen at the Mayo Clinic to review heart testing done at the University of Chicago. (R. 509-13.) Allyson Palmer, MD, noted that Plaintiff was "doing a great job of staying active with walking 5-6 times per week." (R. 513.)

On April 8, 2022, Plaintiff was assessed by Shreyasee Amin, MD. (R. 501-05.) In regard to her lupus, Dr. Amin stated: "Overall, she continues to feel achy but her weakness seems to have resolved." (R. 502.) Plaintiff reported having 20 minutes of morning stiffness; pain in her hands with joint swelling; shoulder and neck pain that can wake her up at night; knee pain with bending or weather changes; and muscle pain and spasms for about a year. (R. 502.) However, Plaintiff reported no clear muscle weakness. (R. 502.) Dr. Amin also mentioned Plaintiff's history with migraines, stating Plaintiff got an aura with nausea, vomiting, and frontal headaches and had migraines about two weeks out of a month. (R. 502.) She thought Plaintiff might benefit from review in a headache clinic. (R. 504.) Plaintiff had been experiencing low-grade fevers,

---

[18]    Toradol is a brand name for ketorolac, an anti-inflammatory medication. *See* Ketorolac (oral route, injection route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/ketorolac-oral-route-injection-route/description/drg-20066882 (last visited Feb. 27, 2025).

night sweats, and had lost 12 pounds.  (R. 504.)  Plaintiff's general energy had been low over the preceding 6-7 months.  (R. 504.)  Plaintiff was not in acute distress.  (R. 503.)  While she had pain with the range of motion in her neck, there was no significant limitation.  (R. 503.)  "There was no evidence of soft tissue swelling or effusions in any of the joints of her upper or lower extremities.  Well-preserved range of motion.  No stress pain."  (R. 503.)  At the time of the appointment, Plaintiff was working for First Transit driving buses.  (R. 503.)  She had no concerns involving her hands or shoulders that day.  (R. 504.)

On May 9, 2022, Plaintiff was seen by Zachary Ashmore, MD.  (R. 496.)  Plaintiff reported to Dr. Ashmore that she had had two years of pain along the back of her left thigh and anterolateral leg.  (R. 496.)  The pain was described as burning and tingling ranging from three to nine out of ten in intensity, and was worse with activity, lying on that side, lifting, or prolonged sitting.  (R. 496.)  Plaintiff reported the pain was frequently accompanied by numbness in a correlating pattern.  (R. 496.)  Plaintiff described occasional numbness and tingling in her left upper extremity when her left lower extremity symptoms were significantly worse.  (R. 496.)  She had occasional relief with ibuprofen and Tylenol, had some relief with physical therapy, but none with acupuncture.  (R. 496.)  Plaintiff stated that the pain significantly interfered with her job as a driver with the Mayo Clinic and that she had already had to change her job function as she was unable to work a desk job due to pain and numbness.  (R. 496.)  X-rays taken on April

26, 2022 showed degenerative hypertrophy[19] of the lumbar facet joints.  (R. 497.)  But Plaintiff's gait was again normal and she had a normal pain-free range of motion in her spine.  (R. 497.)  Straight leg raise test was negative for both legs.  (R. 497.)  Plaintiff also recounted her history of migraines and stated that she got migraines twice a week.  (R. 88.)  She planned to resume her physical therapy at home and the doctor recommended considering medications specific for neuropathic pain.  (R. 497.)

An MRI of Plaintiff's lumbar spine in May 2022 showed a bulged disc at L4-L5 that mildly extended and slightly abutted the L4 nerve root.  (R. 545.)  A CT scan surveyed on June 2, 2022 showed a subtle "corduroy" pattern suggestive of a vertebral hemangioma in the T7 area.[20]  (R. 637-38.)

On June 7, 2022, Plaintiff was seen by Physical Therapist Karli Kerzman.  (R. 636-40.)  The appointment notes again state that Plaintiff had a two-year history of left sided buttock and leg pain, burning and tingling in quality and ranging from three to nine out of ten in severity.  (R. 637.)  The record states that "[o]verall she reports her status is worsening."  (R. 637.)  Plaintiff states that she used to notice symptoms after sitting for about 30 minutes, but at the time of the appointment noticed discomfort immediately

---

[19]    Facet hypertrophy is when a facet joint becomes too swollen or enlarged and blocks openings through which nerve roots pass.  *See* Facet Joint Syndrome, Cedars Sinai, https://www.cedars-sinai.org/health-library/diseases-and-conditions/f/facet-joint-syndrome.html#:~:text=If%20the%20facet%20joint%20becomes,condition%20is%20called%20facet%20hypertrophy (last visited Feb. 27, 2025).

[20]    A spinal hemangioma is a type of tumor of the spine.  *See* Dawood Tafti & Nathan D. Cecava, Spinal Hemangioma, Nat'l Lib. of Med. (July 31, 2023), https://www.ncbi.nlm.nih.gov/books/NBK532997 (last visited Feb. 27, 2025).

when she sits down. (R. 637.) Aggravating factors included: "[m]ainly sitting, also activity, lying on that side, lifting, or prolonged sitting" and relief came through "frequently changing positions." (R. 637.) Plaintiff reported going through two cycles of about two months of physical therapy and "had some relief the 2nd time" but had not continued the exercises. (R. 637.) Bursa injections[21] had not provided much relief and acupuncture was not helpful. (R. 637.) The record also states that Plaintiff was walking every day for 30 minutes and that it "feels good." (R. 637.) On physical examination, Plaintiff had normal, non-antalgic gait and was able to walk on her heels and toes without difficulty. (R. 638.) She had normal range of motion in the lumbar and hip regions, with no provocation of symptoms with repeated movement in the lumbar region. (R. 638.) Her lower extremity strength was 5/5 except 4/5 hip abduction strength on the left, but that was not painful. (R. 638.) She had impaired core strength. (R. 638.) Straight leg testing caused hip discomfort on the left and a seated slump test was positive on the left. (R. 638.) She also had hypomobility on the left side of her lower lumbar spine. (R. 638.) PT Kerzman instructed Plaintiff on a home exercise program focused on hip strength and discussed the rational and expected outcomes with Plaintiff. (R. 638.) PT Kerzman summarized the findings as follows:

> Examination findings were significant for weakness or reduced tissue capacity to tolerate loads and impairments in core strength. Functional deficits include difficulty with sitting for any length of time, difficulty with standing, currently not working due to this. Patient would benefit from further skilled physical therapy to improve strength to allow for increased

---

[21]    Bursa injections are anti-inflammatory steroid injections used to treat joint pain. *See* Burse Injection, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/ 21663-bursa-injection (last visited Feb. 27, 2025).

capacity of tissues to tolerate loads and monitor progress and manage the
dose of strengthening to optimize tissue loading.

(R. 639.)  PT Kerzman opined that Plaintiff had good potential to achieve those goals

within a 180-day time frame, involving up to 20 visits, if she actively participated in her

physical therapy plan and home program.  (R. 639.)

Plaintiff visited the emergency room on June 22, 2022 with back pain.  (R. 673.)

X-rays and an EKG were completed and Plaintiff was diagnosed with left thorax pain,

likely musculoskeletal, and was released after feeling better.  (R. 675.)

On July 5, 2022, Plaintiff was referred to Alicia Sticha, PA, for consideration of a

left L5 transforaminal epidural steroid injection.[22]  (R. 671-72.)  Plaintiff again

complained of tingling and aching pain in her left buttock and left lower extremity made

worse through prolonged sitting, lying on her left side, or prolonged standing.  (R. 672.)

She noted that the pain was improved with short durations of standing.  (R. 672.)  After

consultation with PA Sticha, Plaintiff underwent the procedure the next day.  (R. 670-73.)

On October 3, 2022, Plaintiff was seen by Thomas Osborn, MD, for dry eyes and

dry mouth with parotid gland swelling.  (R. 1037.)  Plaintiff reported pain in her hands,

wrists, and ankles in the winter and stress and achiness with sun exposure.  (R. 1038.)

Her review of systems was positive for pain or stiffness in the joints.  (R. 1038.)  On

examination, Dr. Osborn noted tenderness of the finger joints in Plaintiff's hands and

---

[22]    Epidural injections deliver anti-inflammatory medicine into a space around the
spinal cord and are used to treat those with chronic lower back pain.  *See* Epidural
Injections for Back Pain, MedlinePlus, https://medlineplus.gov/ency/article/007485.htm
(last visited Feb. 27, 2025).

right wrist.  (R. 1038-39.)  However, her "[r]ange of motion of the extremities including shoulders and hips [we]re within functional limits bilaterally."  (R. 1039.)  She had grossly intact proximal and distal strength in her upper and lower extremities.  (R. 1039.)  Plaintiff was still taking 200 mg of hydrochloroquine twice daily and Dr. Osborn prescribed a Medrol[23] pack.  (R. 1039.)

As part of her appeal of her original application denial (R. 80-91), Plaintiff filled out a function report on August 1, 2022.  (R. 317-324.)  Plaintiff described her daily activities as: "I get up wash up eat breakfast Take meds, Take nap, Read watch a little TV, Take nap, Tidy up, eat dinner, Take meds go to bed."  (R. 318.)  She claimed that she "may" prepare a meal about once a week and did laundry and cleaned the house once a week.  (R. 319.)  Plaintiff said she did in-person shopping for groceries and personal needs twice a month for one hour.  (R. 320.)  She also stated that she had issues bending and lifting, but also that she could "only lift 20 lbs."  (R. 322.)  She listed hydroxychloroquine, topiramate, and cyclobenzaprine[24] as her prescription medications. (R. 324.)

---

[23]    Medrol is an anti-inflammatory steroid medication used to slow an overactive immune system.  *See* Methylprednisolone Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/19300-methylprednisolone-tablets (last visited. Feb. 27, 2025).

[24]    Cyclobenzaprine is a muscle relaxant.  *See* Cyclobenzaprine, Medline Plus, https://medlineplus.gov/druginfo/meds/a682514.html (last visited Feb. 27, 2025).

B.    **Opinion Evidence**

The ALJ considered the opinions of two consultative examiners, John O'Regan, PhD, and A. Neil Johnson, MD.  Dr. O'Regan examined Plaintiff on April 28, 2022.  (R. 475-79.)  During the examination, Plaintiff told Dr. O'Regan that: "[S]he is disabled because she suffers from 'joint pain' and sciatica in her left leg.  She believes that she can only sit for 10 to 15 minutes before she needs to get up.  She struggles with migraines." (R. 475.)  She was taking Topamax and sumatriptan for migraines, as well as lisinopril,[25] metformin,[26] atorvastatin,[27] and a lupus medication.  (R. 476.)  He noted that Plaintiff was employed "here and there," but her left sciatica, joint, leg, and finger pain prevented her from "working long."  (R. 476.)  Plaintiff stated that she had been working at a "driving job" recently, but stopped because "sitting was a problem," estimating that she could only sit for 10-15 minutes.  (R. 476.)  For her daily functioning, Plaintiff reported that her daughters did the cooking and laundry while also buying groceries for the family. (R. 476.)  Plaintiff reported taking a shower, brushing her teeth, doing her hair, taking her medicine, and eating breakfast each morning.  (R. 476.)  She liked to read the bible for

---

[25]    Lisinopril is a blood pressure medication.  *See* Lisinopril (oral route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/lisinopril-oral-route/description/drg-20069129 (last visited Feb. 27, 2025).

[26]    Metformin is a medication used to treat type 2 diabetes.  *See* Metformin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a696005.html (last visited Feb. 27, 2025).

[27]    Atorvastatin is a medication used to reduce the risk of stroke or heart attack as well as reduce the chance of developing heart disease.  *See* Atorvastatin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a600045.html (last visited Feb. 27, 2025).

relaxation and had good focus while doing so. (R. 476.) Plaintiff thought she could work three days a week for four hours a day and reported going online five to six hours every day looking for jobs. (R. 476.) Dr. O'Regan diagnosed Plaintiff with the following: generalized anxiety disorder; panic disorder; post-traumatic stress disorder; and "rule out NREM Sleep arousal disorder, sleepwalking type." (R. 478.) He concluded that Plaintiff "should be able to carry out work-like tasks with reasonable pace or persistence" and would be able to "tolerate the stress and pressure typically found in entry-level work place [sic]." (R. 478.)

Dr. Johnson completed a physical examination on Plaintiff on May 20, 2022. (R. 480.) Plaintiff reported:

> [B]eing diagnosed with lupus in 2010. She did have butterfly rash with sun. She does see a rheumatologist at Rochester Mayo. At one point she was on Methotrexate but didn't tolerate it. She is now on Hydroxychloroquine. That dose was recently increased. She gets back pain with sciatic type symptoms into the buttock and left thigh. She reports arthralgias of her hands, ankles and feet. She had a back x-ray which showed some osteopenia apparently but not much else. She is scheduled for a lumbar spine MRI at the Mayo Clinic in Rochester at 7:00 tonight. She has had a left knee meniscus procedure in 2014 and had a lipoma removed from the left leg in 2012. She does not use an assistive device. She estimates she can walk 15 minutes, about 5 minutes, and stand 15 minutes. She can lift 15 to 20 pounds with both hands. She can use her hands to button, pick up a coin, write and use silverware. She cannot open ajar lid. She can use a hammer. She cannot use a screwdriver. She can do a zipper and tie shoelaces. She can take care of her own personal hygiene. She can thread a needle and deal cards. She can do stairs but finds it difficult and uses the railing. She cannot do a ladder or run. Squatting can be difficult and she has to hold on. She can tandem walk. She denied any incontinence. She has a lot of trouble sitting and in fact she states that was the main reason she had to stop working in 2018. She worked in medical records at a hospital. . . . She drove to the examination.

(R. 481.)  He noted that Plaintiff has numbness of the toes and fingers, and had a history of migraines since she was 18, which she got twice a week, resulting in light and noise sensitivity, and caused her to be nauseous and vomit.  (R. 481.)

On physical examination, Plaintiff walked normally without an assistive device, had no difficulty getting on and off the exam table, no difficulty tandem walking, and mild to moderate difficulty squatting.  (R. 482.)  Dr. Johnson also noted "[t]here is tenderness at the mid and left lower back and into the left buttock."  (R. 482.)  The straight leg raising test was negative and there was no paravertebral muscle spasm.  (R. 482.)  Her Romberg was negative, her motor strength seemed intact except for the hands, sensation of the legs was intact, and she had some numbness of the fingertips and toes.  (R. 483.)  Plaintiff did "have weak pinch and grip."  (R. 483.)  Plaintiff described multiple joint pains, said she was seeing a rheumatologist at the Mayo Clinic, described "what may be radiculopathy into the left leg" and said she had tenderness from the back into her left buttock and thigh.  (R. 484.)  Dr. Johnson diagnosed Plaintiff with hypertension, diabetes mellitus, and lupus.  (R. 484.)

C.    **Hearing Testimony**

The ALJ held a hearing on Plaintiff's case on February 8, 2023.  (R. 17.)  At the hearing, the ALJ asked Plaintiff about her medical history.  The portions relevant to this action are summarized below.

When asked about her lupus, Plaintiff testified that she was suffering from swelling behind her ears on the jawbone as well as achy and swelling joints, exacerbated by the weather, for which her medication had recently been increased.  (R. 44-46.)

Plaintiff testified, "I have difficulty with my hands in general," that she did not "have any strength in them," and that they were painful all day.  (R. 50.)  She testified that she could not open a bottle of water and had difficulty doing the dishes, lifting the dishes, grasping her toothbrush, brushing her teeth, and sweeping.  (R. 50.)  She said she has told her doctor about her pain, but the medications that have been prescribed do not help.  (R. 50.)

Plaintiff was also asked about her back pain.  Plaintiff testified that she was having a lot of pain in her back that would radiate down her left leg.  (R. 46, 49.)  That pain limited her in sitting down, standing up, or lying down.  (R. 46, 49.)  She said that she can stand for about 45 minutes with "no pain" before "excruciating pain" starts.  (R. 49.)  Plaintiff testified that she then has to lie down "for at least an hour" before becoming active again and sitting "doesn't help it either."  (R. 49.)  She said she lies down on her right side because the pain radiates from her left side.  (R. 49.)  She had received both physical therapy and an epidural injection in her spinal area for the pain.  (R. 46, 50.)  She stated that the injection allowed her to sit longer than normal, from 10-15 minutes to about 30-45 minutes, before having to get up.  (R. 46.)  She also said she had difficulty lifting.  (R. 50.)

As to her migraines, Plaintiff testified that she had two migraines a month and they last between three to five days, resulting in her being bedridden during that time. (R. 47.)  She said that even with medication, there is nothing she can do to help her migraines but to let it "run its course."  (R. 48.)  Plaintiff stated that she used to get migraines approximately two weeks out of a month, but since taking the migraine

24

medication Topamax, "they have cut down" and she was getting no more than "a couple

[of] migraines" a month.  (R. 47.)

> When asked what is preventing her from working, Plaintiff stated the following:
>
> I would just say it's the pain in the hands. It's the fluctuating between the sitting and the standing. It's difficult for me to sit at the desk unless it's at home doing home -- you know, working from home where I can you know, stand, sit, stand, sit. My hands, like I said, they are really -- they're painful. It's difficult to actually do computer work anymore with them, and those are the things that actually my work history consists of, and those things have become hard to do.

(R. 51-52.)

Plaintiff also testified regarding her work history.  Plaintiff stated she previously

worked for CJS Solutions Group as a receptionist, where she sat at a desk with a

computer and telephone and was required to lift items weighing ten pounds or less.  (R.

40-41.)  She also worked as a medical records clerk, where she sat approximately 75% of

the time and lifted items up to 20 pounds in weight.  (R. 42-44.)

Vocational expert ("VE") Rebecca Kendrick also testified at the hearing.  VE

Kendrick testified that a claimant with Plaintiff's age, education, and work history, along

with the limitations set forth in the ALJ's RFC, could perform Plaintiff's past work as

medical records clerk.  (R. 53-54.)  VE Kendrick further testified that a person with that

age, education, work history and RFC could perform other jobs in the economy,

including merchandise marker, cashier II, and cleaner, housekeeping positions.  (R. 54-

55.)  On examination by Plaintiff's attorney, the VE testified that the jobs would not

allow for a sit stand option every 45 minutes or the option to sit for 45 minutes and then

stand or walk for 15 minutes unless it was accommodated.  (R. 58-59.)  Finally, Kendrick

concluded that a position of this kind might only tolerate one absenteeism per month, with anymore resulting in reprimand or termination.  (R. 58.)

### III.    LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018).  As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence . . . is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (cleaned up).

"This court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Nash*, 907 F.3d at 1089 (citation omitted and cleaned up).  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).  "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision."  *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson*

*v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Lucas v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011)).  The record is viewed in the light most favorable to the agency's determination.  *Chismarich*, 888 F.3d at 980.

## IV.    DISCUSSION

Plaintiff seeks remand on the grounds that the ALJ failed to properly evaluate her subjective complaints pursuant to Social Security Regulation ("SSR") 16-3p, frustrating meaningful review and resulting in an RFC that is not supported by substantial evidence. (Dkt. 13 at 9-17; *see also* Dkt. 16 at 1-5.)  According to Plaintiff, the ALJ failed to abide by the requirements of SSR 16-3p and failed to consider the factors laid out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  (*See* Dkt. 13 at 9-19.)  The Commissioner responds that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were unsupported by the record and that Plaintiff could perform a range of light work.  (Dkt. 15 at 6-17.)

When determining a claimant's RFC, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms.  Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Mar. 16, 2016); *see, e.g.*, *Bryant v. Colvin*,

861 F.3d 779, 782 (8th Cir. 2017) ("Part of the RFC determination includes an

assessment of the claimant's credibility regarding subjective complaints.").[28]

> In considering the intensity, persistence, and limiting effects of an
> individual's symptoms, [the ALJ] examine[s] the entire case record,
> including the objective medical evidence; an individual's statements about
> the intensity, persistence, and limiting effects of symptoms; statements and
> other information provided by medical sources and other persons; and any
> other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  Such evaluation includes consideration of "(i) the

claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's

pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side

effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*,

860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2016

WL 1119029, at *7.  "Credibility determinations are the province of the ALJ, and as long

as good reasons and substantial evidence support the ALJ's evaluation of credibility,

[courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th

---

[28]     As background:

> SSR 16-3p eliminates the use of the term "credibility" from the [Social
> Security Administration's] sub-regulatory policy, as the regulations do not
> use this term. In doing so, the [Social Security Administration] clarifies that
> subjective symptom evaluation is not an examination of an individual's
> character. Instead, the [Social Security Administration] will more closely
> follow [the] regulatory language regarding symptom evaluation."

*Krick v. Berryhill*, No. 16-cv-3782 (KMM), 2018 WL 1392400, at *7 n.14 (D. Minn.
Mar. 19, 2018) (quotation omitted) (cleaned up); *see* SSR 16-3p, 2016 WL 1119029, at
*1; *see also* Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p,
2017 WL 5180304, at *1 (Soc. Sec. Oct. 25, 2017) (republishing SSR 16-3p and
clarifying SSR 16-3p applies to "determinations and decisions on or after March 28,
2016").

Cir. 2016) (quotation omitted); *see Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

Plaintiff first argues that the ALJ improperly rejected her subjective complaints solely because they were not substantiated by the objective evidence. (Dkt. 13 at 11-12.) She also contends that the ALJ did not logically connect his conclusions to the evidence he relied on and failed to address the *Polaski* factors. (*Id.* at 12-14.) Finally, Plaintiff challenges the conclusions drawn from the evidence the ALJ did discuss, specifically precipitating and aggravating factors, dosage, effectiveness, and side effects of medication, and the functional restrictions described by Plaintiff. (*Id.* at 14-16.) According to Plaintiff, the evidence the ALJ relied on supports her subjective complaints about her DDD, SLE, and migraines. (*Id.* at 16-17.)

The Commissioner disagrees, stating that the ALJ's opinion sufficiently relied on Plaintiff's treatment history, her daily activities and work history, and her subjective complaints. (Dkt. 15 at 7.) The Commissioner states that the ALJ had no requirement to accept the subjective complaints as true, but instead was tasked with comparing those complaints against the objective medical evidence. (*Id.* at 7-8.)

The ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision" and then discussed in detail the evidence he relied on. (R. 23-25.) Having reviewed the ALJ's opinion and the record, the Court finds substantial evidence supports the ALJ's

conclusion that Plaintiff's subjective complaints relating to her DDD are not entirely consistent with the record. As a starting point, the Court notes that the ALJ stated that he reviewed the record "based on the requirements of 20 C.F.R. 416.929 and SSR 16-3p." (R. 23 (no section symbol in original).) And contrary to Plaintiff's assertions, the ALJ did discuss Plaintiff's testimony regarding symptoms arising from her lupus, DDD, and migraines in the decision. (*See* R. 23 (describing testimony, including precipitating and aggravating factors such as temperature).)

As to Plaintiff's DDD, the ALJ noted instances where Plaintiff had normal or largely normal physical examinations with respect to her gait, spine, and range of motion. (R. 24 (citing R. 426, 428 (Dec. 20, 2021 appointment); 516 (Feb. 10, 2022 appointment); 503 (Apr. 8, 2022 appointment); 496-97 (May 9, 2022 appointment); R. 481-85 (May 20, 2022 consultative exam with Dr. Johnson); 546 (spinal MRI analyzed on May 22, 2022); 645-46 (June 2, 2022 analysis of May 20, 2022 MRI); 636-39 (June 7, 2022 physical therapy appointment); 673-75 (June 22, 2022 appointment); 670-71 (July 6, 2022 appointment).) The ALJ also described Plaintiff's treatment, which consisted of acupuncture in February 2022 and physical therapy in June 2022. (*See* R. 24.) The ALJ also noted Plaintiff had received an epidural injection for back pain in July 2022. (R. 24.) The ALJ properly considered Plaintiff's conservative course of treatment with respect to her DDD when assessing her subjective complaints of pain. *See Buford v. Colvin*, 824 F.3d 793, 796-97 (8th Cir. 2016); *Michlitsch v. Berryhill*, No. 17-cv-3470 (MJD/TNL), 2018 WL 3150267, at *16 (D. Minn. June 12, 2018) (injections and physical therapy

considered conservative treatment for pain), *R. & R. adopted*, 2018 WL 3150225 (D. Minn. June 27, 2018).

Similarly, with respect to Plaintiff's lupus-related subjective complaints, the ALJ considered her course of treatment (including medication), subjective complaints to providers, and objective tests results. (*See* R. 24-25 (discussing intact motor strength except for weak pinch and grip during May 20, 2022 consultative examination; lupus medications in December 2021; Plaintiff's report of feeling "achy," pains, and muscle spasms in April 2022 but no evidence of soft tissue swelling or effusions of the joints and well-preserved range of motion and intact strength; and tenderness in the finger joints and wrists but normal range of motion and intact strength in October 2022)).

Finally, as to her migraines, the ALJ considered Plaintiff's course of medication and treatment, including a September 2021 visit where she reported having migraines about ten days a month and lingering pain most days, as well as a December 2021 report highlighting that Topomax had reduced the frequency of her migraines from three times a week to seven to eight times a month. (R. 25.) The ALJ further noted that Plaintiff had received a Toradol shot for a headache possibly related to Covid-19 in January 2022 and reported having migraines about two weeks of every month in April 2022. (R. 25.) Given that the ALJ acknowledged Plaintiff's testimony and discussed her medical history relating to migraines, including her reports to providers, it is unclear what other factors Plaintiff believes the ALJ should have considered.

Further, substantial evidence in the record as a whole supports the ALJ's decision to discount Plaintiff's subjective complaints. Beginning with Plaintiff's DDD, the record

is replete with instances where Plaintiff exhibited a normal range of motion and normal gait. (*E.g.*, R. 376-77 (July 27, 2020 appointment); R. 364-366 (Sept. 9, 2020 appointment); 859 (Sept. 1, 2021 appointment); 427-28 (Dec. 20, 2021 appointment); 412 (Dec. 21, 2021 appointment); 415-16 (Jan. 26, 2022 appointment); 503 (Apr. 8, 2022 appointment); 497 (May 9, 2022 appointment).) Plaintiff had negative straight leg raise tests on several occasions, including on May 9, 2022 and May 20, 2022. (R. 482, 497.)

As to Plaintiff's lupus, Dr. Yalamanchili observed on September 9, 2020 that Plaintiff had strong grip strength, normal muscle strength, a normal ability to perform fine and gross manipulations, and had no issues with various tasks involving fingering or manipulating small objects. (R. 364-65.) Dr. Johnson concluded on May 20, 2022 that Plaintiff was able to lift 15 to 20 pounds with both hands, use her hands to button, pick up a coin, write and use silverware, use a hammer, do a zipper, tie shoelaces, and take care of her own personal hygiene. (R. 481.) Plaintiff did not challenge Dr. Johnson's conclusions, which the ALJ found partially persuasive as they were well-supported and mostly consistent with other evidence. (R. 26.) And, as the ALJ noted, in October 2022, while Dr. Osborn observed tenderness of the finger joints in Plaintiff's hands and right wrist, she had grossly intact proximal and distal strength in her upper and lower extremities and range of motion and sensation were intact. (R. 1039.) There were no reports of difficulties with fingering or manipulation during this visit. (*See* R. 1039.) Further, while Plaintiff reported joint pain when establishing care for her lupus with Dr. Amin in April 2022, she did not report difficulties with fingering or manipulation at that

32

time—rather, she had a well-preserved range of motion, normal strength testing, and "[n]o current concerns involving her hands." (*See* R. 501-504.)

As to her migraines, Plaintiff testified that a migraine leaves her bedridden and typically lasts between three to five days each. (R. 48.) But while she received treatment for migraines and described their frequency, she never reported such debilitating effects to a medical professional.

Moreover, Plaintiff's activities of daily living undermine her subjective complaints of pain. On January 13, 2022, Plaintiff reported that she was exercising five days a week for 60 minutes a session. (R. 420.) As of March 4, 2022, she reported walking five to six days a week. (R. 513.) However, she reported that she walked every day for 30 minutes, which felt "good." (R. 637.) Plaintiff also reported reading the bible for relaxation, shopping in stores, online, and by phone, including for about an hour twice a month, and performing some household chores with the assistance of her daughters. (R. 319-20, 476.) Such activities are inconsistent with her testimony regarding the severity of her subjective complaints. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1035, 1038-39 (8th Cir. 2001) (weighing claimant's activities of "getting up, eating, reading, cleaning the house, making the bed and doing dishes with the help of her husband, making meals, visiting with friends, and occasionally shopping and running errands" as evidence that was inconsistent with a disability due to hand pain and swelling). While Plaintiff "need not prove she is bedridden or completely helpless to be found disabled," *see Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotation marks omitted), her daily activities can nonetheless be seen as inconsistent with her subjective complaints and may

33

be considered in assessing the severity of her subjective complaints, *see Vance v. Berryhill*, 860 F.3d 1114, 1121 (8th Cir. 2017).

Additional relevant evidence was Plaintiff's repot in April 2022 that she was spending five to six hours each day online looking for jobs and believed she could work three days a week for four hours a day.  (R. 476.)  "[T]his record of contemplating work indicates [the claimant] did not view [her] pain as disabling."  *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995) (citing *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994)).  Based on this evidence and a review of the record, the Court concludes that substantial evidence—including the objective medical evidence, Plaintiff's activities of daily living, her course of treatment, and her pursuit of employment during the relevant period— supports the ALJ's decision to discount her subjective complaints.

In sum, while the ALJ may not have "mechanically walked through each of the *Polaski* factors," he did "provid[e] good reasons for not finding Plaintiff's subjective complaints wholly credible, reasons which are supported by substantial evidence in the record" and meet the requirements of *Polaski* and SSR 16-3p, including discussing her reports to medical providers, the objective evidence, and her course of treatment.  *See Michlitsch*, 2018 WL 3150267, at *17 (finding ALJ satisfied *Polaski* and requirements of SSR 16-3p's predecessor (SSR 96-7p)).  "[C]aselaw is clear the ALJ is not required to discuss each factor."  *Id.* (citing *Bryant*, 861 F.3d at 782; *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).  The Court finds that the ALJ "minimally articulate[d] his reasons for crediting or rejecting evidence

of disability." *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)).

Plaintiff also argues that "substantial evidence also fails to support the ALJ's RFC determination because the evidence cited by the ALJ appears to support Plaintiff's subjective complaints." (Dkt. 13 at 16.)  As discussed above, the Court finds the ALJ's assessment of Plaintiff's subjective complaints supported by substantial evidence.  Moreover, while Plaintiff points to evidence inconsistent with the ALJ's decision, the issue "is not whether substantial evidence exists to reverse the ALJ," but "whether substantial evidence supports the ALJ's decision."  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  Here, the evidence discussed above does support the ALJ's decision and meets the substantial evidence standard.  Accordingly, the Court rejects Plaintiff's challenge to the RFC.  For all of these reasons, the Court denies Plaintiff's Motion for Summary Judgment.

## V.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff Stephanie L.'s Motion for Summary Judgment (Dkt. 12) is **DENIED**;

2.    Defendant's request that the Court affirm the decision (Dkt. 15) is **GRANTED**;

3.    The hearing set for March 24, 2025 is **CANCELLED**; and

4.    This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

DATED: February 28, 2025                    _s/Elizabeth Cowan Wright_
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge